IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:10cr006 |
| | ) | |
| | ) | JUDGE HAYNES |
| BEAU C. VAUGHAN | | |

## MEMORANDUM

The United States of America filed this criminal action against defendant Beau C. Vaughan, charging him with conspiracy to possess with intent to distribute 100 kilograms or more of marijuana.

Before the Court is Defendant's motion to suppress (Docket Entry No. 14), to which the Government has responded (Docket Entry No. 21). Defendant asserts that the physical evidence and statements obtained as a result of his arrest and the searches of his vehicle, residence, and mother's residence should be suppressed as a violation of his Fourth and Fifth Amendment rights. Specifically, Defendant contends that he was arrested without probable cause, the search of his vehicle was too broad, his confession was improperly obtained, and the subsequent consent searches of his and his mother's residence were fruit of the poisonous tree of the unlawful arrest. The Court held a suppression hearing on December 6, 2010 (Docket Entry No. 25, Transcript), and both parties submitted post hearing briefs. (Docket Entry Nos. 26, 27). For the reasons stated below, Defendant's motion to suppress should be denied.

### A. ANALYSIS OF THE EVIDENCE

On November 11, 2009, Agent Darryl Richardson of the Tennessee Bureau of Investigation ("TBI") received information regarding a possible drug transaction involving

1

Defendant. Agent Richardson contacted Trooper Michael Kilpatrick of the Tennessee Highway Patrol to seek assistance with a traffic stop. On November 13, 2009, Agent Richardson asked Trooper Kilpatrick to conduct a traffic stop on the Defendant's vehicle if he could develop independent probable cause. Agent Richardson provided information about Defendant's vehicle to Trooper Kilpatrick. That morning, agents conducting surveillance observed Defendant depart his girlfriend's house, place a heavy duffel bag in his truck, and travel to O'Charley's, the suspected location of the drug transaction.

At approximately 10:15 a.m. on November 13, 2009,[1] Trooper Kilpatrick effectuated a traffic stop of Defendant's vehicle at O'Charley's after observing Defendant driving without a seatbelt. The traffic stop was videotaped. (Government Exhibit 1, Suppression Hearing). Trooper Wayne Dunjleman also arrived with his narcotics detection canine, Rock. Trooper Kilpatrick approached Defendant's vehicle, informed Defendant that he was issuing a traffic citation for driving without a seatbelt, and Defendant conceded he was not wearing the seatbelt. Trooper Kilpatrick instructed Defendant to exit his vehicle and began to issue a citation for driving without seatbelt and proof of insurance.

Trooper Kilpatrick stated that Defendant's eyes appeared bloodshot and he could "smell the odor of burnt marijuana coming from inside the vehicle." (Docket Entry No. 25, at 11). Trooper Kilpatrick patted down Defendant, administered a field sobriety test, and inquired about Defendant's prior criminal history. Trooper Kilpatrick requested consent to search Defendant's vehicle, which Defendant refused. Id. at 16. Trooper Kilpatrick informed Defendant that there would be a canine search of Defendant's vehicle and inquired if narcotics were in the vehicle. Id. at 17. Defendant stated that he had approximately $15,000 in the vehicle, but no drugs.

---

[1] Times cited herein are from the video recording of the traffic stop. The Court notes that Kilpatrick testified the stop occurred around 9:53 a.m., the time on traffic citation. (Docket Entry No. 25, at 16).

2

Defendant stated that he had not smoked marijuana in the vehicle. Id. at 18, 20. Rock conducted a canine search of Defendant's truck within approximately ten minutes of the traffic stop. Rock, a certified narcotics detection canine, successfully completed the Tennessee Department of Safety, Drug Detector Dog Training Course and has received recertification training. (Government Exhibit 3, Canine records). Rock has a 100% proficiency rate in training and an actual find rate of 86.7%. Id. Rock is trained to make an aggressive alert, such as scratching. Id.

Trooper Kilpatrick remained with the Defendant behind his truck when Rock conducted the canine search. On the video, Rock scratched on the driver's side door. Troopers Dunjleman and Kilpatrick testified that Rock alerted to the driver's door of Defendant's vehicle. (Docket Entry No. 25, at 17, 57-58). Trooper Kilpatrick confiscated Defendant's cellular telephone after Defendant continued to push buttons on it. Id. at 19. At 10:28 a.m., Trooper Kilpatrick placed Defendant in the rear of his patrol car for the search.

Trooper Dunjleman searched the inside of Defendant's vehicle, recovering only cash. Rock then conducted a canine search of the exterior of the locked toolbox. Rock scratched on the toolbox and Trooper Dunjleman announced that Rock alerted to the toolbox. Id. at 20-21, 59-60. The troopers obtained the toolbox keys and searched the toolbox. Within a box inside the toolbox, troopers recovered additional cash, dryer sheets, trash bags, and a "little bit of marijuana residue." Id. at 21. The troopers identified the residue based upon their experience and training and took a photograph, but did not order any subsequent laboratory analysis. The Defendant contends that there was not marijuana residue in the vehicle.

The troopers recovered approximately $15,000 in cash from Defendant's vehicle, all in $100 bills. (Government Exhibit 4, Suppression Hearing, photographs). Defendant told the

3

troopers that the $15,000 was from the sale of a vehicle. The troopers searched Defendant's vehicle again and recovered a suspected drug ledger, airline tickets to Dallas, Texas, and a rental car agreement from McCallen, Texas. Id. at 21-23. Trooper Kilpatrick testified that McAllen is a source city for narcotics and dryer sheets are commonly used to mask the odor of narcotics. Id. at 23-24. Law enforcement spent time following-up on leads from the documentary evidence seized from the vehicle.

Defendant was placed in the rear seat of the patrol car during the search for approximately one and a half hours. During this time, Defendant could not exit the patrol car. Id. at 37. Trooper Kilpatrick's canine was also in the rear seat of the patrol car with Defendant in a cage. Id. at 37. Trooper Kilpatrick asked Defendant questions, but did not read Miranda[2] warnings to Defendant because he was afraid it would "shut him up for good." (Government Exhibit 2, Videotape Transcript, at 32). Defendant asked if he was under arrest or being detained. Trooper Kilpatrick responded that Defendant was not under arrest, but he was being detained and was "not free to leave." Id. at 19, 32. Defendant does not allege that he made any incriminating statements in the patrol car.

At 11:45 a.m., Agent Richardson removed Defendant from the patrol car and provided verbal Miranda warnings.[3] Agent Richardson testified as follows, in pertinent part:

> Q. What happened when you arrived at the O'Charley's?
>
> A. When I arrived at the O'Charley's, I think I spoke with Trooper Kilpatrick and Trooper Dunjleman. I was just kind of looking at the evidence that they had found, kind of wanted to see it for myself. We discussed that the marijuana wasn't there. I think Trooper Kilpatrick told me he had received several text messages, some people wanting to meet with him. After that point I went on back to the car to speak with Mr. Vaughan.

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).
[3] Defendant states that Agent Richardson's recitation of the Miranda warnings, and Defendant's oral waiver, was not on the videotape. Yet, the Court notes that Agent Richardson's testimony was uncontroverted.

4

Q. And when you spoke with Mr. Vaughan, did you read him his rights?

A. I did.

Q. Did you ask Mr. Vaughan any questions before you read him his rights?

A. No, I did not.

Q. Did Mr. Vaughan agree to speak with you?

A. He did.

Q. What did Mr. Vaughan tell you at that time?

A. **Mr. Vaughan said that he had already been in Federal prison and he didn't want to go back.** He talked about the charges possibly being serious. He discussed about what kind of court it would be in. I told him I had no idea, that it wasn't up to me; I would have to talk with the prosecutor about it. And Mr. Vaughan was increasingly nervous about sitting at O'Charley's parking lot. He didn't want to be seen talking to me there. He asked if we could go to another location to talk . . .
At this point, I walked up to talk to Trooper Kilpatrick and I asked him just to move his car forward, **that Mr. Vaughan wanted to cooperate, that he voluntarily wanted to ride back with me to my office.** I told Mr. Vaughan that I was going to have them park his car at O'Charley's and he was adamant that it be moved to somewhere else. . .

Q. Mr. Vaughan told you he wanted to cooperate?

A. Right.

Q. He said he did not want to go back to Federal prison?

A. Right.

Q. He asked if he could speak with you somewhere other than the parking lot?

A. That is correct.

Q. And then he asked you if someone would move his truck so it wouldn't be left there at the O'Charley's?

A. Right.

| | |
|---|---|
| Q. | And someone did move the truck? |
| A. | . . . .moved it to the Kroger parking lot at his request. |

* * *

| | |
|---|---|
| Q. | Did you take Mr. Vaughan back to the TBI office? |
| A. | I did. That was at his request . . . [.] |

* * *

| | |
|---|---|
| Q. | Did you interview Mr. Vaughan that day? |
| A. | I did. |
| Q. | And where did you do that? |
| A. | I did that in my office at TBI. |

* * *

| | |
|---|---|
| **Q.** | **Again, Mr. Vaughan wasn't ever handcuffed?** |
| **A.** | **No, he was not.** |
| **Q.** | **Did you tell him he was free to leave if he wanted to?** |
| **A.** | **He was free to leave from me at this point.** |
| **Q.** | **Did you tell him that?** |
| **A.** | **Yes, he knew he did not have to talk to me.** |
| **Q.** | **Did you tell him that he didn't have to cooperate with you if he didn't want to?** |
| **A.** | **Yes.** |

* * *

| | |
|---|---|
| Q. | At some point did the interview come to a close? |
| A. | **It did. Mr. Vaughan was extremely cooperative.** He agreed to sign a consent form for a search of his residence . . . [.] |

Id. at 95-99, 101-102 (emphasis added).

There were three officers present during Defendant's interview with Agent Richardson at the TBI office, and several other officers outside. Id. at 123. Defendant made incriminating statements about marijuana and the cash. Defendant then provided consent to search his residence, from which officers recovered drug ledgers, marijuana, and drug paraphernalia. Defendant took the officers to his mother's residence resulting in the seizure of approximately $12,000. Defendant also permitted a search of his storage unit. Defendant met with agents the next day to continue his cooperation, but ceased cooperating at an undefined point thereafter. Id. at 110-11. Specifically, Agent Richardson testified:

>    Q. Did you meet with [the Defendant] again the next day?
>
>    A. Yes, I did.
>
>    Q. Did he provide you further information?
>
>    A. We discussed where the truck was exactly.
>
>    \*   \*   \*
>
>    Q. At some point did Mr. Vaughan cooperate with you any further after that time?
>
>    A. No, he did not.

Id.

## B. CONCLUSIONS OF LAW

### A. Fourth Amendment

The Fourth Amendment protects individuals from unreasonable searches and seizures and evidence that stems from unreasonable searches or seizures must be suppressed. Wong Sun v. United States, 371 U.S. 471, 488 (1963). Traffic stops are seizures within the meaning of the Fourth Amendment. Whren v. United States, 517 U.S. 806, 809-10 (1996).

"Under the Fourth Amendment, there are three types of permissible encounters between police and citizens: consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked some questions; a temporary involuntary detention or Terry[4] stop which must be predicated upon 'reasonable suspicion;' and arrests which must be based on probable cause." United States v. Alston, 375 F.3d 408, 411 (6th Cir. 2004) (quoting United States v. Bueno, 21 F.3d 120, 123 (6th Cir. 1994)).

### 1. Validity of initial traffic stop

As to the validity of the initial traffic stop, it is undisputed that Trooper Kilpatrick observed Defendant driving without a seatbelt. This provided probable cause for the traffic stop. Even though the traffic stop was an attempt to intercept narcotics, the subjective intentions of an officer are irrelevant if there is probable cause to believe a traffic violation has occurred. Whren, 517 U.S. at 813. Defendant "does not contest the initial stop of Vaughan's vehicle based upon his failure to secure his seatbelt." (Docket Entry No. 26, at 1).

### 2. Validity of warrantless search of Defendant's vehicle

The next issue is whether there existed probable cause to search the Defendant's vehicle. "[T]he Sixth Circuit [has] reiterated that a positive reaction by a properly trained narcotics dog can demonstrate the existence of probable cause for the presence of controlled substances, if the training and reliability of the dog are established." United States v. Huerta, 247 F.Supp.2d 902, 907 (S.D. Ohio 2002) (citations omitted). Here, a trained narcotics detection canine at the scene alerted to Defendant's vehicle. During cross-examination, defense counsel questioned the method of presenting that Trooper Dunjleman utilized to direct Rock to the door and toolbox. (Docket Entry No. 25, at 73-75). The Government offered proof that Rock was a certified drug

---

[4] Terry v. Ohio, 392 U.S. 1 (1968).

detection canine with a strong record of reliability, and the video depicts Rock scratching the car. Moreover, as a separate matter, Trooper Kilpatrick smelled burnt marijuana in Defendant's vehicle. Thus, the Court concludes that probable cause existed to justify the search the Defendant's vehicle.

Defendant argues that the scope of the search was too broad. Specifically, "the search of Mr. Vaughan's vehicle, while arguably supported by the troopers' purported smelling an odor of marijuana and the drug dog's supposed 'hit' (assuming *arguendo* the Court believe those two events actually occurred), still did not include the trooper's seizure and reading of Mr. Vaughan's journal, logbook, or other documents once their search of the truck for drugs proved futile," citing United States v. Perez, 440 F.3d 363, 375 (6th Cir. 2006). The Government responds that the probable cause to search the vehicle extended to both drug and non-drug evidence, citing United States v Howard, 621 F.3d 433, 2010 WL 3543174, *17 (6th Cir. 2010).

In Perez, in upholding the search of a duffel bag after a canine alerted to the vehicle, the Sixth Circuit held that "an officer with probable cause to search a vehicle for drugs may inspect any item in that vehicle that could contain drugs, whether or not the item belonged to the driver, a passenger, or someone else claiming an expectation of privacy in its contents." 440 F.3d at 375. In United States v. Howard, the Sixth Circuit concluded that there was probable cause to search the defendant's vehicle based upon a canine alert and the resulting seizure of cash was proper. 621 F.3d at 454-55. "Because the search of [defendant's vehicle] was supported by probable cause, independent of Howard's unlawful arrest, the cash contained inside of the vehicle was properly seized." Id. at 455 (citing Arizona v. Gant, --- U.S. ----, ----, 129 S.Ct. 1710, 1721, (2009)).

Here, the Court concludes that the troopers had probable cause to search the entire truck, including the toolbox. Thus, the cash and documentary evidence contained inside Defendant's vehicle was properly seized and should be upheld.

### 3. Validity of Defendant's detention in patrol car

The next issue is whether Defendant's detention in the patrol car amounted to a full-blown arrest without probable cause. (Docket Entry No. 26, at 1-2). The Government responds that this was a valid Terry detention, but even but even if there were an arrest, the troopers had probable cause to arrest Defendant. (Docket Entry No. 21, at 8-9).

"A seizure of the person within the meaning of the Fourth and Fourteenth Amendments occurs when, 'taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business . . . [.]'" Kaupp v. Texas, 538 U.S. 626, 629-30 (2003) (quoting Florida v. Bostick, 501 U.S. 429, 437 (1991)(internal quotations omitted). The Sixth Circuit explained what distinguishes a Terry stop from a full-fledged arrest:

> Indeed, a Terry stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." United States v. Perez, 440 F.3d 363, 372 (6th Cir.2006) (quoting Terry, 392 U.S. at 20). The detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." Id. (quoting Florida v. Royer, 460 U.S. 491, 500, (1983)). "The investigative means used should also be the least intrusive means reasonably available to verify or dispel the officer's suspicions in a short period of time." Id.
>
> When the nature of a seizure exceeds the bounds of a permissible investigative stop, the detention may become an arrest that must be supported by probable cause. Smoak v. Hall, 460 F.3d 768, 780-81 (6th Cir. 2006).. Yet, there is no litmus test for determining when the line is crossed. We consider such factors as the length of the detention, the manner in which it is conducted, and the degree of force used in determining whether an investigative stop is reasonably related to the basis for the original intrusion. Id. at 781.

Dorsey v. Barber, 517 F.3d 389, 398-99 (6th Cir. 2008).

Here, a trooper confiscated Defendant's cellular phone, placed him in the rear seat of a patrol car next to a canine under constant detention for approximately one and a half hours. During this time, Trooper Kilpatrick told Defendant that he was being detained and was not free to go. Taking into account all of the circumstances, the Court concludes that the troopers' conduct would have communicated to a reasonable person that he was not free to leave and therefore the Defendant was then under arrest.

As to whether the Court concludes that the troopers then had probable cause to support an arrest, probable cause for a warrantless arrest has been defined as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." United States v. Padro, 52 F.3d 120, 122-123 (6th Cir. 1995) (citation and internal quotations omitted). "Determinations of probable cause are based on a review of the 'totality-of-the-circumstances,' and involve a practical, common sense review of the facts available to the officer at the time of the search." Id. at 123 (citations omitted). "Probable cause is satisfied when the facts and circumstances within the officer's knowledge, based on reasonably trustworthy information, are sufficient to warrant a man of reasonable caution to believe that an offense has been or is being committed." United States v. Bonilla, No. 08-3461, 357 Fed.Appx. 693, 695 (6th Cir. Dec. 21, 2009) (citation omitted).

Prior to the traffic stop, Jeremy Abernathy, a cooperating source advised Agent Richardson that the Defendant sold marijuana and agreed to meet Abernathy to sell drugs at 10:00 a.m. in O'Charley's parking lot on November 19th. Agent Richardson informed Trooper Kilpatrick about a possible drug transaction involving Defendant at O'Charley's. That morning, law enforcement observed Defendant place a heavy duffel bag into his vehicle and drive to the O'Charley's parking lot at approximately 10:00 a.m. At the traffic stop, Trooper Kilpatrick

smelled the odor of burnt marijuana in Defendant's vehicle and observed Defendant's red eyes. Within approximately ten minutes of the beginning of the traffic stop, a certified narcotics canine alerted to Defendant's vehicle, but the officers found only marijuana residue. The resulting search of the Defendant's truck revealed approximately $15,000 in $100 bills, a rental car agreement from a narcotics source city, dryer sheets, a suspected drug ledger, and what the troopers' experience told them was marijuana residue.

"[A] positive result [by a trained canine] would have resulted in his justifiable arrest on probable cause." Florida v. Royer, 460 U.S. 491, 506 (1983). McAllen, Texas is known as a city where drugs are smuggled into the United States from Mexico. United States v. Garcia, 447 F.3d 1327, 1333 (11th Cir. 2006); United States v. Sierra, No. 07-31021, 294 Fed. Appx. 884, 886 (5th Cir. Sept, 30, 2009); and United States v. Lopez, 518 F.3d 790, 792 (10th Cir. 2008). In United States v. Davis, the Sixth Circuit noted that "dryer sheet" were "used to mask the order of drugs." 430 F.3d 345, 366 (6th Cir. 2005) (quoting United States v. Stephens, No. 96-6551, 1997 WL 720412, *3, n.2 (6th Cir. Nov. 17, 1997)).

The totality of these facts lead the Court to conclude that the troopers had probable cause that an offense had been or was being committed. Accordingly, Defendant's arrest was supported by probable cause.

### B. Fifth Amendment

Under the Fifth Amendment to the United States Constitution, a defendant in a criminal case cannot be compelled to be a witness against himself. Consistent with that right, the Supreme Court held in Miranda v. Arizona that "if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent." 384 U.S. 436, 467-68 (1966). Under Miranda, a defendant may waive his

constitutional right to remain silent and to consult with an attorney, provided the waiver is made voluntarily, knowingly, and intelligently. 382 U.S. at 444.

### 1. Validity of confession

Here, Defendant argues that even if there were a valid Miranda waiver, his confession remains inadmissible as a Fifth Amendment violation, citing Brown v. Illinois, 422 U.S. 590 (1975) and Kaupp v. Texas, 538 U.S. 626 (2003), both of which involved improper police conduct. Specifically, Defendant argues his confession "had no temporal separation from his illegal detention; there was no intervening event of significance; the impropriety of Vaughan's detention was obvious; and his illegal arrest, both in design and execution, was investigatory. Under such circumstances, Miranda makes no difference whatsoever." (Docket Entry No. 26, at 4). The Government responds that even if there were an improper arrest or detention, Defendant's subsequent statements and cooperation were sufficiently attenuated from statements made prior to his Miranda waiver. Id. at 9.

In Kaupp, the Supreme Court considered the validity of a confession made shortly after an unlawful arrest. 538 U.S. at 632. In holding the confession should be suppressed, the Supreme Court stated in pertinent part:

> Since Kaupp was arrested before he was questioned, and because the State does not even claim that the sheriff's department had probable cause to detain him at that point, well-established precedent requires suppression of the confession unless that confession was "an act of free will [sufficient] to purge the primary taint of the unlawful invasion." Wong Sun v. United States, 371 U.S. 471, 486 (1963). Demonstrating such purgation is, of course, a function of circumstantial evidence, with the burden of persuasion on the State. See Brown v. Illinois, 422 U.S. 590, 604 (1975). **Relevant considerations include observance of Miranda, "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct."** 422 U.S. at 603-604 (footnotes and citation omitted).

13

>       The record before us shows that only one of these considerations, the giving of Miranda warnings, supports the State, and we held in Brown that "Miranda warnings, alone and per se, cannot always . . . break, for Fourth Amendment purposes, the causal connection between the illegality and the confession." 422 U.S., at 603 (emphasis in original) . . . All other factors point the opposite way. There is no indication from the record that any substantial time passed between Kaupp's removal from his home in handcuffs and his confession after only 10 or 15 minutes of interrogation. In the interim, he remained in his partially clothed state in the physical custody of a number of officers, some of whom, at least, were conscious that they lacked probable cause to arrest. See Brown, supra, at 604-605. In fact, the State has not even alleged "any meaningful intervening event" between the illegal arrest and Kaupp's confession. Taylor v. Alabama, 457 U.S. 687, 691 (1982). Unless, on remand, the State can point to testimony undisclosed on the record before us, and weighty enough to carry the State's burden despite the clear force of the evidence shown here, the confession must be suppressed.

Id. at 632-33 (emphasis added).

The Supreme Court described its holding in Brown that a confession made less than two hours after an unlawful arrest should be suppressed when the illegality "had a quality of purposefulness." 538 U.S. at 605. There "was no intervening event of significance whatsoever" between the illegal arrest and the first statement and the second statement was unlawful as fruit of the unlawful first statement. Id. at 604. The Supreme Court explained:

> The imp[ro]priety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that the purpose of their action was 'for investigation' or for 'questioning.' The arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up. The manner in which Brown's arrest was affected gives the appearance of having been calculated to cause surprise, fright, and confusion.

Id at 605 (footnote and record citation omitted).

Applying Kaupp and Brown principles here, Trooper Kilpatrick purposely did not provide Miranda warnings. Yet, the Defendant is not alleged to have made any incriminating

14

statements while in the trooper's vehicle[5]. Agent Richardson then provided verbal <u>Miranda</u> warnings. Defendant, however, decided to cooperate with the officers to avoid his return to prison. Defendant requested that he speak to Agent Richardson at another location, the TBI office, and continued to cooperate with the officers later than day and at least the following day. Because there was not an unlawful search, arrest, or confession, the Court need not reach Defendant's remaining argument that the consent searches were fruit of the poisonous tree.

## C. CONCLUSION

For the foregoing reasons, Defendant's motion to suppress (Docket Entry No. 14) should be denied.

An appropriate Order is filed herewith.

Entered on this the ___ day of February, 2011.

                                                WILLIAM J. HAYNES, JR.
                                                United States District Judge

---

[5] The Court has grave concerns that the seating of the Defendant in the trooper's vehicle next to the trooper's canine for one and a half hours was coercive, rendering the Defendant's subsequent statements involuntary, but there is not any proof here that this seating affected this Defendant.